**MASSEY–FERGUSON CREDIT CORPORATION, Respondent,**

v.

**Patricia J. BLACK and Lisa Ann Black, Appellants.**

**No. 54067.**

Missouri Court of Appeals, Eastern District, Division Three.

Jan. 17, 1989.

138

Carla Wood Tanzey, Private Atty., Mexico, for respondent.

Carrie Diane Francke, Private Atty., Columbia, for appellants.

SIMON, Judge.

Appellants, Patricia J. Black and Lisa Ann Black, appeal a judgment entered on a jury verdict in favor of respondent, Massey–Ferguson Credit Corporation, awarding respondent $1,363.00 together with interest in the amount of $807.00 on Count I and $30,038.00 together with interest in the amount of $17,630.00 on Count II. Count I alleged that both appellants had signed a Retail Installment Contract and Security Agreement with respondent secured by a B & B cultivator. Count II alleged that appellant, Patricia J. Black, had signed a Retail Installment Contract and Security Agreement secured by a Massey–Ferguson 540 combine, a table, and a reel. Respondent alleged that appellants had made no payments on either contract.

On appeal, appellants contend that the trial court erred in: (1) overruling their motion to disqualify opposing counsel in that respondent's counsel had represented appellants in a substantially related matter; (2) denying their motion to dismiss for lack of standing to assert a claim because respondent's corporation is not registered as a foreign corporation in Missouri and is, therefore, unable to maintain a suit under § 351.635 RSMo (1978) (all references shall be to RSMo 1978 unless otherwise noted); (3) allowing respondent's counsel to question appellant, Patricia J. Black, about collateral matters, such as prior litigation, placing her character in issue, and improperly stating the import of such litigation; (4) refusing Instruction No. A, defining the term "commercially reasonable," which is not within the common understanding of the jury; and (5) denying their motion for a directed verdict at the close of all the evidence and in denying appellants' motion for a new trial because the evidence was insufficient to show that the respondent disposed of the repossessed collateral in a commercially reasonable manner. We affirm.

In October of 1982, appellants purchased a used B & B cultivator for $2,750.00. Appellant made a cash down payment of $825.00, leaving an unpaid balance of $1,925.00 which the appellants financed at 18.9%. The amount financed was to be paid in annual installments, the first of which was due November 1, 1983. Appellant, Patricia J. Black, also purchased a new Massey–Ferguson 540 Combine, a table, and a reel. The total purchase price was $59,100.00. A $10,000.00 rebate and $12,600.00 trade-in left a balance of $36,500.00 which was financed at 18.9% interest. The payments were to be paid in four annual installments, with the first being due on November 1, 1983. Both the cultivator and the combine were purchased from Brandenburger Brothers, Inc. (Brandenburger), of Bowling Green, Missouri.

Brandenburger sold Massey–Ferguson and Case Farm Equipment as well as various equipment that was received in trade. Brandenburger sold the combine and cultivator to the appellants. The financing contracts were assigned to respondent, a corporation incorporated under the laws of the state of Maryland and not registered to do business in Missouri.

Brandenburger delivered the combine to Patricia J. Black on approximately October 20, 1982. At that time, the Blacks were farming the Wallace Hollander farm in Audrain County. The Blacks obtained the farm from Wallace Hollander after arranging to pay some of Hollander's creditors. Patricia J. Black testified that she and her husband were in the bail bonding business at that time and had "bonded out" Hollander several times. When Hollander skipped bond, he and his sister called the Blacks and asked them to "bond Hollander out." The Blacks made arrangements to pay the bills on the farm and made arrangements for an attorney for Hollander. Hollander later filed for bankruptcy. The bankruptcy court set aside the transfer of the farm to the Blacks and ordered the Blacks off the farm in December of 1982. The Blacks were unable to take the cultivator and combine with them when they left.

David Avis, the area finance manager for respondent testified that the Black's first payment on the combine and the cultivator was due November 1, 1983. On December 13, he advised the office to send a demand letter to the Blacks giving them until Janu-

ary 9, 1984 to make the payment. On January 3, 1984, Avis called Patricia J. Black to inquire whether she had received the letter. Patricia J. Black asked Avis to call back in one week to talk with Bob Black, her husband. When Avis talked with Bob Black, he learned that the equipment was tied up in the Hollander bankruptcy case, and that the equipment could not be removed from the Hollander farm. In late April of 1984, respondent filed a motion in the bankruptcy court to have the equipment released. The equipment was released from bankruptcy on May 23, 1984. Brandenburger went to the farm, retrieved the equipment, and took it to its lot.

Avis testified that respondent followed standard procedure for selling repossessed equipment. On June 15, 1984, Avis inspected the equipment and made a wholesale and retail appraisal of the equipment. The wholesale value is the true value of a piece of machinery. The retail value is the wholesale value of the machinery plus the dealer's profit for selling the machinery. The retail price can also include the cost of fixing the machinery and providing a warranty. Avis asked for wholesale and retail appraisals from two farm equipment dealers. Clyde Wilson, a sales manager for Caldwell's Massey–Ferguson in Canton, Missouri, appraised the equipment over the telephone. Based on five years of experience in the farm equipment business, Wilson appraised the cultivator at $900.00 wholesale and $1,100.00 retail and the combine at $17,000.00 wholesale and $20,000.00 retail. Larry Brandenburger appraised the cultivator at $1,200.00 wholesale and $1,500.00 retail. He appraised the combine at $18,500.00 wholesale and $22,000.00 retail.

Next, Avis ascertained the wholesale value which is published in the National Farming Power Equipment Dealer's Association. This guide is similar to the "Blue Book" in the car industry. The guide publishes values of farm equipment. The values in the book are the average of values reported by the farm equipment dealers in the United States that belong to the association. The retail value listed was $27,130.00 and the wholesale value was listed at $22,376.00.

Avis then averaged the three appraisal figures together to come up with a figure which respondent would bid at the repossession sale. Respondent set the minimum bid at $1,050.00 for the cultivator and $19,292.00 for the combine.

Avis testified that the equipment was in good shape with only 144 hours on the combine. He testified that the bid was low compared to the amount the Blacks originally paid for the equipment, because the machinery depreciated after being taken off the dealer's lot. He also testified that the economy was bad at the time and this factor probably contributed to the lower bid price.

After Avis arrived at a figure for a minimum bid, he placed an advertisement for the repossession sale in the Bowling Green Times. The advertisement ran in the newspaper on June 27, 1984, and again on July 4, 1984. Respondent sent a letter to Patricia J. Black and Lisa Ann Black advising them that the repossession sale would take place on July 9, 1984 at 10:00 a.m. The letter stated that the accelerated balance due on the equipment was $50,551.59, and that the Blacks could get the equipment back if they paid the remaining balance on the contract plus the expenses of repossession. The letter urged the Blacks to try to interest possible purchasers at the sale so that a higher resale price could be obtained. Patricia J. Black testified that she did not contact anyone to try to convince them to appear and bid at the sale.

Avis held the repossession sale as scheduled on July 9, 1984 at 10:00 a.m. on Larry Brandenburger's lot. The only people at the sale were Avis and Larry Brandenburger. No one else was present. After asking for bids, Avis announced that he was making a bid for Massey–Ferguson, Inc. When no one else placed a bid, Avis declared that the equipment was sold to Massey–Ferguson for the minimum of $1050.00 for the cultivator and $19,292.00 for the combine. Avis testified that he would not postpone the sale when no one showed up because holding a second sale would just cost appellants more money. Following

the sale, notification of the deficiency was mailed to appellants.

In their first point, appellants contend that the trial court committed error in overruling their motion to disqualify opposing counsel because respondent's counsel had represented appellants in a "substantially related" matter. Appellants attached three exhibits to their brief to support their contention. These exhibits include a bill from respondent's counsel's law office which indicates that someone in the office conferred with a Cody Ice, performed research, drafted motions, and drafted an order and a dissolution bond. Also included is a letter to Cody Ice confirming that counsel is no longer representing Cody Ice, Marilyn Ice, James R. Black, Lisa Ann Black, Patricia Jane Black, C & M Bailbonds, Inc. or Missouri Enterprises, Inc. At the bottom of the bill is a typed "cc: Bob Black." The third exhibit is a handwritten receipt for $250.00. The names Patricia Jane Black and Lisa Ann Black are printed at the top of the receipt.

Appellants contend that respondent's counsel represented appellants in acquiring the Hollander farm and that her representation somehow contributed to their current inability to pay for the farm equipment. They claim respondent's counsel knew the circumstances surrounding the Hollander bankruptcy, and therefore should have withdrawn from representing the respondent.

Rule 1.9 of the Rules of Professional Conduct provides in relevant part:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation;

The comments to Rule 1.9 provide in relevant part:

The scope of a "matter" for purposes of Rule 1.9(a) may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree.... The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.

Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.

Here, it is not apparent that respondent's counsel represented appellants in the "same or a substantially related matter." The exhibits attached to appellants' brief indicate that respondent's counsel represented Cody Ice on a matter on August 17, 1981, and that counsel ceased to represent Cody Ice and appellants on August 27, 1981. It is not clear what was the subject matter of the representation. However, appellants assert that respondent's counsel represented appellants in the acquisition of the Hollander farm. Taking this as true, the question is whether the acquisition of the Hollander farm is "the same or a substantially related matter," and whether respondent's counsel changed sides on the matter in question.

Although respondent's counsel may have obtained information regarding the acquisition of the farm or appellants' financial situation, such information was not "the same or substantially related" to the issues in this trial. The farm and/or appellants' financial situation were not issues in the trial. The issues were whether appellants breached the financing contract with respondent, whether the appellants owed respondent the difference between the contract price and the amount received for the equipment at the repossession sale, and whether the repossession sale was handled in a commercially reasonable manner.

Appellants also contend that respondent's counsel further demonstrated a conflict of interest by asking whether Holland-

er claimed that appellants fraudulently obtained the farm from Hollander, when respondent's counsel knew that that was actually the claim of the bankruptcy trustee. However, this information was common knowledge in the community, and was also a matter of public record. Thus, respondent's counsel did not breach the duty to appellants by using this information at trial. Therefore, the trial court did not err in refusing to disqualify respondent's counsel.

■ In their second point, appellants contend that the trial court erred in denying their motion to dismiss for lack of standing to assert a claim because respondent's corporation is not registered as a foreign corporation with the Missouri Secretary of State, and is therefore unable to maintain a suit under § 351.635. Appellants first made a motion to dismiss for lack of standing on the morning of trial.

Section 351.570 provides in relevant part:
*351.570. Certification, foreign corporation*

1. No foreign corporation shall have the right to transact business in this state including business on any federal or state owned property in this state until it shall have procured a certificate of authority so to do from the secretary of state....

2. Without excluding other activities which may not constitute transacting business in this state, a foreign corporation shall not be considered to be transacting business in this state, for the purposes of this chapter, by reason of carrying on in this state any one or more of the following activities:

(1) Maintaining or defending any action or suit or any administrative or arbitration proceeding, or effecting the settlement thereof or the settlement of claims or disputes;

\* \* \* \* \* \*

(6) Soliciting or procuring orders, whether by mail or through employees or agents or otherwise, where such orders require acceptance without this state before becoming binding contracts;

(7) Borrowing money or creating evidences of debt, mortgage or lien on or other security interest in real or personal property;

(8) Securing or collecting debts or enforcing any rights in property securing the same;

(9) Transacting any business in interstate commerce;

Section 351.635 provides in relevant part:
*351.635. Failure to procure a certificate, penalty, how enforced*

Every foreign corporation now doing business in or which may hereafter do business in this state which shall neglect or fail to comply with the provisions of subsection 1 of section 351.570.... in addition to which penalty, no foreign corporation, failing to comply with this chapter, can maintain any suit or action, either legal or equitable, in any of the courts of this state, upon any demand, whether arising out of the contract or tort, while the requirements of this chapter have not been complied with.

Thus, § 351.635 penalizes a foreign corporation doing business within the state by denying the corporation the right to sue in the state of Missouri. Section 351.570.2(9) provides, however, that a foreign corporation will not be considered to be doing business within the state where the corporation transacts business in interstate commerce.

What constitutes doing business is a question "to be determined on the facts in each case, and the 'burden of proof is on the defendants to establish plaintiff was doing business in this state'." *American Trailers, Inc. v. Curry*, 621 F.2d 918, 919[1, 2] (8th Cir.1980) (quoting *Filmakers Releasing Organization v. Realart Pictures*, 374 S.W.2d 535 (Mo.App.1964)). Section 351.635 is applicable in those situations in which the foreign corporation conducts intrastate business in Missouri but does not comply with the certification requirements. *Benham v. Cox*, 677 S.W.2d 429, 431[2] (Mo.App.1984). The intent of § 351.635 is to penalize foreign corporations for failing to comply with § 351.570. *Id.* at 431[3, 4]. If a corporation is not subject to § 351.570,

there is no purpose to apply the penalty provisions of § 351.635. *Id.* A corporation which does not do any business in Missouri is not subject to the statute. *Id.*

Here, appellants purchased equipment from Brandenburger and financed the purchase by signing the Retail Installment Contracts and Security Agreements. Brandenburger mailed the contracts to respondent for acceptance of the assignment of the financing agreements. Contracts for assignment become effective when accepted by the respondent's office in Des Moines, Iowa. Brandenburger assigned the contracts signed by appellants to respondent on October 22 and 26, 1982. Therefore, the only business which respondent conducted was receipt of a credit application through the United States mail, notice of acceptance of the assignment, also sent through the United States mail, arrangements made to dispose of the equipment at auction, and the institution of an action to recover the deficiency. It is clear that respondent's business was transacted in interstate commerce. § 351.570.2(9). Further, filing of the action is clearly permitted under § 351.570.2(1), (8). Point denied.

In their third point, appellants assert that the trial court abused its discretion in controlling the cross-examination of Patricia J. Black. They argue that the trial court allowed respondent's counsel to question her about collateral matters, thereby putting her character in issue. Appellants claim that respondent should not have been allowed to examine the witness about prior litigation.

The trial court has broad discretion in the control of cross-examination. *Lineberry v. Shull*, 695 S.W.2d 132, 136[9, 10] (Mo.App. 1985). It is permissible, on cross-examination, to ask questions which tend to test the credibility, veracity or accuracy of the witness. *Greco v. Robinson*, 747 S.W.2d 730, 736[11, 12] (Mo.App.1988). A review of the record reveals that, on direct examination, Patricia J. Black testified that she was unable to farm the Hollander place because her family was ordered off the farm by the bankruptcy judge in 1982. She also testi-

fied on direct examination that she was not farming any other property in 1982. Cross-examination of these issues was therefore permissible to test the accuracy and credibility of Patricia J. Black's statements. Appellants may not complain of cross-examination on issues to which they opened the door. Point denied.

In their fourth point, appellants claim that the trial court committed error in refusing appellants' proffered definition of "commercially reasonable".

Respondent offered Instruction No. 5, which the trial court submitted:

### INSTRUCTION NO. 5

The phrase "commercially reasonable" as used in these instructions means that every aspect of a sale held pursuant to a security agreement including the method, manner, time, place and terms must be commercially reasonable. The sale may be by public or private proceedings and may be made by way of one or more contracts. The sale may be as a unit or in parcels and at any time and place and on any terms. Reasonable notification of the time and place of any public sale shall be sent by the secured party to the debtor. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner.

NOT IN MAI—Submitted by Plaintiff. While appellants offered Instruction No. A:

### INSTRUCTION NO. A

The phrase "commercially reasonable manner" as used in these instructions

means a manner which will result in the secured party selling the secured goods in the usual manner in any recognized market at the current and best price reasonably obtainable in such market to produce the maximum amount from the sale of the security and in accordance with reasonable custom and commercial practices among dealers in the same or similar types of property sold.

The secured party must act in good faith, avoid loss, make an effective realization on the goods sold, sell in the usual manner in a recognized market at the current price, and sell in conformity with reasonable commercial practices among dealers in the type of property sold.

Not in MAI—Submitted by Defendants.

 Whether to submit a definitional instruction to the jury is within the sound discretion of the trial court. *DeWitt v. American Family Mut. Ins. Co.*, 667 S.W. 2d 700, 711[35–37] (Mo. banc 1984). The definition of "commercially reasonable" is not found in the MAI. When an instruction is not found in the MAI, the test of that jury instruction is whether it "follows the substantive law and can be readily understood." *Southern Missouri Bank v. Fogle*, 738 S.W.2d 153, 157[5] (Mo.App. 1987). Instruction No. 5 closely tracks the statutory language of the Uniform Commercial Code's definition of "commercially reasonable" set out in Sections 400.9–504(3) and 400.9–507(2) RSMo.

Section 400.9–504(3) provides that:

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, and except in the case of consumer goods to any other person who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a security interest in the collateral. The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

While Section 400.9–507(2) states:

(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.

Thus, the instruction which the trial judge chose to give tracks the substantive law and is readily understood. There was no error. Point denied.

In their final point, appellants contend that the trial court erred in denying their motion for a directed verdict at the close of

the evidence and erred in denying appellants' motion for a new trial because evidence was insufficient to show that respondent disposed of the repossessed collateral in a commercially reasonable manner.

■ We first address appellants' contention that the trial court erred in denying their motion for a directed verdict at the close of all the evidence. "We note that where failure to grant a directed verdict for the defendant is the error asserted, the appellate court must determine whether or not the plaintiff [respondent] presented substantial evidence at trial supporting his theory of recovery." *Strebler v. Rixman*, 616 S.W.2d 876, 877[1] (Mo.App.1981). The appellate court must review the evidence in the light most favorable to the plaintiff, giving the plaintiff the benefit of all reasonable inferences. *Id.* Defendant's evidence must be disregarded except as it aids the plaintiff. *Id.*

■ The burden of proof on the issue of commercial reasonableness is placed on the party seeking the deficiency judgment. *First Missouri Bank & Trust Company of Creve Coeur v. Newman*, 680 S.W.2d 767, 770–1[5] (Mo.App.1984). What constitutes commercial reasonableness is set forth in §§ 400.9—504(3) and 400.9—507(2).

Here, Avis testified that respondent followed standard procedure for selling the repossessed equipment. After inspecting the equipment, Avis asked for two wholesale and retail appraisals. He then consulted a "Blue Book" to determine the wholesale and retail price for the equipment. After averaging the three wholesale prices, Avis came up with an amount which respondent would bid at the sale. Next, Avis placed an advertisement in the local newspaper in the section where the advertisements for farm sales normally appeared. The advertisement appeared in two successive weekly editions. Respondent sent a letter to appellants advising them of the repossession sale and urging them to find prospective buyers.

The sale was held as scheduled. Although the sale had been advertised, the only people who showed up were Avis and Brandenburger. Hearing no other bids, Avis placed a bid on behalf of respondent.

Although the price may have been low, respondent presented evidence that farm equipment depreciated rapidly after purchase. There was also testimony that the farm economy was bad at the time of the sale. Thus, there was substantial evidence that respondent sold the farm equipment in a commercially reasonable manner. Therefore, the motion for a directed verdict was properly denied.

■ The appellants also contend that the trial court erred in refusing to grant a new trial because the evidence was insufficient to establish that the sale was commercially reasonable. "Under Missouri law, a jury verdict will not be overturned unless there is a complete absence of probative facts to support the verdict." *Treon v. Hayes*, 721 S.W.2d 789, 791[1] (Mo.App.1986). The court must review the evidence in the light most favorable to the verdict. *Id.* Since we have concluded that respondent presented substantial evidence establishing that the sale was commercially reasonable, the jury verdict was supported by sufficient evidence. Point denied.

JUDGMENT AFFIRMED.

DOWD, P.J., and SIMEONE, Senior Judge, concur.